UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH CAROLINA

ROCK HILL DIVISION

| | |
|---|---|
| MARK FOSTER,<br><br>                    Plaintiff,<br><br>        v.<br><br>ABRAHAM REICHENTAL; DAMON GREGOIRE; CHARLES HULL; WILLIAM E. CURRAN; KEVIN S. MOORE; DANIEL VAN RIPER; WALTER G. LOEWENBAUM II; JIM D. KEVER; KAREN WELKE; PETER DIAMANDIS; AND WILLIAM HUMES,<br><br>                    Defendants,<br><br>        -and-<br><br>3D SYSTEMS CORPORATION,<br><br>                    Nominal Defendant. | No.  0:16-cv-01016-MGL<br><br>SHAREHOLDER DERIVATIVE COMPLAINT (VERIFIED) |

Plaintiff, by his undersigned attorneys, for his verified shareholder derivative complaint, alleges upon information and belief, except as to allegations about himself, which are based upon personal knowledge, as follows, upon the investigation of counsel. This investigation included the review of information relating to the relevant time period obtained from various sources – including, *inter alia*, United States Securities and Exchange Commission ("SEC") filings, court filings in civil proceedings, public reports, press releases, news articles and other media reports. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**SUMMARY OF ACTION**

1.     This is a shareholder derivative action on behalf of nominal defendant 3D Systems Corporation ("3D Systems" or "the Company") against certain of its current and former officers and directors. 3D Systems is a Delaware corporation headquartered in Rock Hill, South Carolina. The Company makes three dimensional ("3D") digital design and fabrication products, including 3D printers, print materials and custom-designed parts for application across a range of industries.

2.     3D Systems was founded in 1986 by defendant Charles "Chuck" Hull ("Hull"), the inventor and patent holder for the original 3D printing technology, who is currently an officer and director of the Company. For many years, 3D Systems was the dominant player in the 3D printing industry and faced relatively little competition. This began to change as 3D printing technology became more widespread and certain competitors began to threaten the Company's dominance by bringing a diverse array of products and services to the market.

3.     In response to these developments, 3D embarked on an aggressive growth strategy in an attempt to shore up its industry position. From 2008 through May 2015, the Company made about 40 acquisitions, including transactions valued at $700 million between 2012 and 2015 alone. In recent years, the Company also introduced a large number of new products to keep up with the competition. The Company's rapid evolution was accompanied by bullish projections from management for future growth and success that caused the stock price to soar to all-time highs.

4.     For example, on October 29, 2013, the Company issued a press release announcing financial results for the third quarter of fiscal year 2013, wherein defendant Abraham Reichental ("Reichental"), President and CEO, proclaimed that the Company had achieved "record revenue" due to "unprecedented" demand for printer units that "more than tripled" last year's sales. The Company significantly raised revenue guidance for the fiscal year, with defendant Reichental proclaiming that the Company would "triple our manufacturing capacity over the next twelve months."

5.      These were but the first in a series of disclosures that would drive the price of 3D Systems stock up from $60 per share to almost $100 per share in a matter of months. Even as the Company began experiencing problems with acquisition integration and operating performance in 2014, defendant Reichental proclaimed on April 29, 2014 that the Company was experiencing "accelerating revenue growth" and would "quadruple" its sales in the next 12 to 18 months.

6.      However, in a series of disclosures beginning in July 2014 and extending into May 2015, the Company revealed that it was suffering from manufacturing capacity constraints and inventory and quality control problems, and would need to devote significant resources to integrating its dozens of acquired companies, causing the stock price to sink to just $22 per share. Before the crash, however, defendants Reichental and Hull, along with several other officers and directors, had sold over **$30 million** worth of shares as the stock price surged in response to defendants' highly positive (but false) statements. By October 2015, defendant Reichental had left the Company.

7.      This action seeks to recoup the losses that 3D has sustained and will sustain due to defendants' misconduct. In addition, plaintiff alleges that corporate insiders sold 3D Systems stock while in possession of material adverse inside information regarding the Company's business prospects, and seeks disgorgement to the Company of all unlawful insider trading proceeds.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(1) because complete diversity exists between plaintiff and each defendant and the amount in controversy exceeds $75,000 exclusive of interest and costs. This action is not a collusive one designed to confer jurisdiction upon a court of the United States that it would not otherwise have.

9.      This Court has jurisdiction over each defendant because each defendant is either a corporation that conducts business in and maintains operations in this District, a citizen of South

Carolina, or is an individual with sufficient minimum contacts with this District so as to render the exercise of jurisdiction permissible under traditional notions of fair play and substantial justice.

10.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) because 3D maintains its principal place of business in this District, one or more of the defendants resides in or maintains executive offices in this District, a substantial portion of the transactions complained of herein occurred in this District, and defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

### Plaintiff

11.     Plaintiff Mark Foster is a current holder of 3D stock and held shares during the relevant period alleged herein. Plaintiff is a citizen of Kansas.

### Nominal Defendant

12.     Nominal Defendant 3D Systems is a Delaware corporation with a principal place of business located at 333 Three D Systems Circle, Rock Hill, South Carolina 29730-7811. 3D Systems is a citizen of Delaware and South Carolina.

### Individual Defendants

13.     Defendant Reichental served as President and CEO of the Company from September 19, 2003 until he left on October 28, 2015. For fiscal year 2013, Reichental received compensation valued at $10,898,483, including $9,356,250 in restricted stock awards and $724,500 in a cash bonus. For fiscal year 2014, Reichental received compensation valued at $6,640,675, including $5,149,500 in restricted stock awards and $602,140 in a cash bonus. On information and belief, Reichental is a citizen of South Carolina.

14.     Defendant Hull serves as Executive Vice President and CTO of the Company and has

been a director since 1993. Hull has served in various executive positions with the Company. Hull is a founder of the Company and has served as CTO since 1997 and as Executive Vice President since 2000. Hull also previously served in other capacities, including CEO, Vice Chairman of the Board of Directors, and President and COO. Hull has entered into a consulting arrangement with the Company pursuant to which, upon retirement, he will become a consultant for four years at a fixed consulting fee that will decline from $275,000 in the first year to $100,000 in the fourth year, and he will remain entitled to continuing life and health insurance coverage. In the Company's 2015 Proxy Statement, it concedes that Hull is not independent. On information and belief, Hull is a citizen of South Carolina.

15.    Defendant Damon J. Gregoire ("Gregoire") served as 3D Systems' CFO from April 25, 2007 until November 11, 2014, when he became Executive Vice President of Mergers & Acquisitions. He also served as Senior Vice President & Principal Accounting Officer until November 11, 2014. For fiscal year 2013, Gregoire received compensation valued at $5,243,276 including $4,776,000 in restricted stock awards and $78,000 in a cash bonus. For fiscal year 2014, Gregoire received compensation valued at $557,004 including $141,100 in a cash bonus. On information and belief, Gregoire is a citizen of South Carolina.

16.    Defendant William E. Curran ("Curran") has served as a director since 2008 and served on the Audit Committee at relevant times. In 2014, Curran received $217,996 in director compensation. On information and belief, Curran is a citizen of New York.

17.    Defendant Kevin S. Moore ("Moore") has served as a director since 1999 and served on the Audit Committee at relevant times. In 2014, Moore received $205,246 in director compensation. On information and belief, Moore is a citizen of New York.

18.    Defendant Daniel S. Van Riper ("Van Riper") has served as a director since 2004 and served on the Audit Committee at relevant times. In 2014 Van Riper received $199,496 in director

compensation. On information and belief, Van Riper is a citizen of Florida.

19.     Defendant G. Walter Loewenbaum, II ("Loewenbaum") has served as a director since 1999. In 2014, Loewenbaum received $279,996 in director compensation. On information and belief, Loewenbaum is a citizen of Texas.

20.     Defendant Jim D. Kever ("Kever") has served as a director since 1996. In 2014, Kever received $172,087 in director compensation. On information and belief, Kever is a citizen of Tennessee.

21.     Defendant Karen Welke ("Welke") has served as a director since 2008. In 2014, Welke received $187,746 in director compensation. On information and belief, Welke is a citizen of Minnesota.

22.     Defendant Peter Diamandis ("Diamandis") has served as a director since 2013. In 2014, Diamandis received $168,746 in director compensation. On information and belief, Diamandis is a citizen of California.

23.     Defendant William Humes ("Humes") has served as a director since 2014. In 2014, Humes received $196,911 in director compensation. On information and belief, Humes is a citizen of California.

24.     The foregoing defendants are sometimes referred to as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

25.     Each of the Individual Defendants, by virtue of his management, executive, and/or directorship positions with 3D Systems, had the duty to exercise due care and diligence and the duty of full and candid disclosure of all material facts related thereto.  The Individual Defendants were required to exercise reasonable care and prudent supervision over the dissemination of information concerning the business, operations, and financial results of 3D Systems.

26.    The Individual Defendants were required to supervise the preparation of 3D Systems' public filings and approve any reports, such as press releases and SEC filings, concerning 3D Systems' financial condition.  The Individual Defendants were prohibited from engaging in unlawful corporate conduct, such as violations of the laws, rules, and regulations applicable to 3D Systems and its business.

27.    Each of the Individual Defendants directly participated in the management of the Company and/or was involved in drafting, producing, reviewing, and/or disseminating the false statements alleged herein, and/or was aware that misleading statements were being issued regarding the Company's operating performance, and approved or ratified these statements.

28.    Because of each of the Individual Defendants' positions with 3D Systems, each knew and had access to non-public information about the business of 3D Systems, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors' meetings and committees thereof, and reports and other information provided in connection therewith.

29.    As alleged below, the Individual Defendants knew, or recklessly disregarded, that the statements about 3D Systems' business and financial condition were false and misleading when made. The Individual Defendants, as corporate fiduciaries entrusted with non-public information, were obligated to disclose material adverse information regarding the Company.

30.    Because of their positions and access to material non-public information, each of the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, shareholders and investors, and that the positive representations that were being made were false and misleading.

31.    Because of their positions of control and authority as directors and/or officers of 3D Systems, the Individual Defendants were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

32.    To discharge their duties as corporate fiduciaries, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of 3D Systems' business and financial affairs.  By virtue of such duties, the Individual Defendants were required, among other things, to:

(a)    manage, conduct, supervise, and direct the business affairs of the Company in accordance with state and federal law, rules and regulations, and the Company's charter and bylaws;

(b)    neither violate nor knowingly permit any officer, director, or employee of the Company to violate applicable law;

(c)    ensure that the Company and each of its officers, directors and employees did not make false or misleading projections regarding the Company's performance;

(d)    maintain and implement adequate and functioning systems of corporate controls, such that 3D Systems' public filings and other publicly disclosed information would be accurate; and

(e)    remain informed as to the status of 3D Systems' operations, and upon receipt of notice or information of imprudent or unsound business practices, to make a reasonable inquiry, and to take steps to correct such conditions or practices and make such disclosures as are necessary to comply with state and federal securities laws.

## SUBSTANTIVE ALLEGATIONS

### I.    Company Background.

8

33.    3D printing is a process of making three dimensional solid objects from a digital file. The creation of a 3D printed object is achieved using additive processes. In an additive process, an object is created by laying down successive layers of material until the entire object is created. Each of these layers can be seen as a thinly sliced horizontal cross-section of the eventual object.

34.    3D printing technology was first developed in the 1970s. 3D Systems has stated that it pioneered 3D printing and digital manufacturing with the invention by co-founder and defendant Hull of a 3D printing technology, known as stereolithography, and an associated file format (.STL). Today, the Company refers to itself as a leading global provider of 3D printing solutions and claims to have the most advanced and comprehensive range of 3D printing products within the additive manufacturing industry.

35.    3D Systems' printers are available in several shapes and sizes and use a wide variety of materials such as plastics, metals, ceramics, and edibles. The Company markets small printers to consumers for home, office, and classroom use, and markets larger "direct metal" printers to business customers for industrial use. These printers can print medical devices, aerospace and automotive parts, personalized accessories and jewelry, toys, art, and many other items.

36.    End-user customers for these printers include individual consumers and businesses in a broad range of industries. The Company sells its products and services to such customers both directly and indirectly through a channel of authorized resellers, who are managed and directed by the Company's channel sales managers. With the exception of online sales and demand parts services, the Company primarily sells its products and services through resellers.

37.    In recent years, 3D Systems has experienced increased competition from companies such as Stratasys, Inc. and Hewlett-Packard Company. In response, the Company has gone on a global acquisition spree to build out its portfolio, buying hardware and software companies at a rapid pace.

For example, between May 2011 and October 2012, the Company bought 16 companies. As one

commentator noted at the time, "even the best management team is going to have a task in front of

them when acquiring that many companies in such a short amount of time."

38.    In July 2013, as the Company's growth by acquisitions continued unabated, defendant

Reichental boasted that interest in the Company was "unprecedented" and that R&D spending would

be increased due to "heavy demand" for its printing products and services. At this time, however,

another commentator noted that the Company's "acquisition binge" could have the effect of "opening

it up to integration risk as well as potential margin dilution."

## II.    False Statements to Shareholders.

39.    While defendants issued very positive statements regarding the Company's

performance as the acquisitions continued, by late 2013 its rush to buy new companies and introduce

new products rendered it unable to capitalize on customer demand due to severe quality and capacity

issues affecting the Company's consumer products and direct metal printers. In addition, the Company

confronted but could not properly resolve costly inventory and shipping problems. However, these

problems would not be timely revealed to shareholders.

### A.  Third Quarter 2013 Release.

40.    To the contrary, on October 29, 2013, the Company issued an earnings release for the

third quarter of fiscal year 2013, announcing that third quarter revenue grew 50% from the prior year

to a record $135.7 million, on a 76% increase in printer and other product revenue and 30% overall

organic growth, with GAAP earnings of $0.17 per share.

41.    In the same earnings release, defendant Reichental boasted of "another record revenue

quarter on unprecedented printer units demand that more than tripled last year's unit sales" and

revenue guidance was raised to $500-530 million for fiscal year 2013.  The release further claimed

that "[f]or the third quarter in a row, the company expanded its manufacturing capacity to accommodate increasing demand for its products and services."

42.    In a subsequent earnings conference call, defendant Reichental stated an intention to "triple our manufacturing capacity over the next 12 months" and highlighted "unprecedented demand" for consumer and direct metal printers. Defendant Reichental further spoke of the imminent introduction of numerous "breakthrough" and "cutting edge" printer products.

43.    Defendant Reichental also stated that "since the beginning of this year, we commercialized 12 new products. And the best is yet to come as we plan to launch just as many new products, including several breakthrough advanced manufacturing printers and professional scanners . . . and cutting-edge consumer printers and scanners . . . .  During the third quarter, we completed several acquisitions in support of our strategic growth initiative[s]. . . . We believe the power accelerated growth rate reflects the strength of our diversified portfolio, the productivity of our channels, and the effectiveness of our strategic initiatives."

44.    In the months following these disclosures, 3D Systems' stock price surged from approximately $60 per share to over $96 per share by the end of 2013.  On December 13, 2013, defendant Reichental sold 25,000 shares of 3D Systems' stock for over $2 million.

**B. Fourth Quarter and Year-End 2013 Release**.

45.    On February 28, 2014, the Company issued an earnings release for the fourth quarter and full fiscal year 2013, announcing that fourth quarter revenue grew 52% from the prior year to a record $154.8 million on 34% overall organic growth, resulting in GAAP earnings of $0.11 per share for the fourth quarter. For the full year 2013, revenue increased 45% to a record $513.4 million on 29% organic growth, resulting in GAAP earnings of $0.45 per share and non-GAAP earnings of $0.85 per share for the year.

46.     In the same earnings release, defendant Reichental boasted that "we are pleased to report another record revenue quarter on robust professional and advanced manufacturing printers' demand, increased materials' growth rate and total unit sales that more than tripled last year's units." Defendant Reichental stated that the Company was "planning to double our revenue over the next couple of years" and that the industry was "at the cusp of accelerated growth."

47.     The earnings release for the quarter also announced continued expansion of the Company's manufacturing capacity "to accommodate increasing demand," and expectations that the Company would achieve 30% organic revenue growth in 2014, or $680-$720 million expected revenue, and double revenue over the next two years. Defendant Reichental added that revenue would have been even higher, but a "stronger order book" resulted in increased backlog.

48.     In a subsequent earnings conference call, defendant Reichental stated that the Company intended to "as much as quadruple sales" of direct metal printers "over the next 12 to 18 months" and "as much as triple" revenues for consumer printers. In response to a question regarding operating expenses, defendant Reichental stated that "based on our planned product lineups, technology, and execution, we don't see any obstacles to success, unless the world collapses somehow."

49.     On February 28, 2014, 3D Systems also filed its 2013 Form 10-K. The Form 10-K stated that the Company was "continuing to expand our global facilities and increase manufacturing capacity to meet demand for our products and services. . . . We are also expanding manufacturing capacity in our other facilities for printers, including at least tripling our direct metals printers' production output." The Company also stated that it was "pursuing a growth strategy" and "working to accomplish our growth initiatives organically and, as opportunities arise, through selective acquisitions," including the building of consumer products. The 2013 Form 10-K was signed by each of the Individual Defendants except Humes.

### C. First Quarter 2014 Release.

50.    On April 29, 2014, while announcing results for the first quarter of fiscal year 2014, the Company touted that it had begun shipping its Cube 3 and CubePro consumer products which were expected to produce "accelerated growth in our consumer category in the second half of this year." The Company also hyped demand for direct metal printers and "very positive" gains in adding manufacturing capacity to capture such demand, leading to accelerated revenue growth.

51.    In the earnings release, the Company announced that first quarter revenue grew 45% from the prior year to $147.8 million on 28% overall organic growth, resulting in GAAP earnings of $0.05 per share and non-GAAP earnings of $0.15 per share for the first quarter.

52.    In a subsequent earnings conference call, defendant Reichental stated that the Company "entered the second quarter of 2014 with positive sales momentum and increased backlog, driven by continued strong demand for advanced manufacturing activities across all of our categories" and expected "accelerating revenue growth through the second half of this year."

53.    According to defendant Reichental, the Company aimed to "quadruple Direct Metal printer sales over the next 12 to 18 months" and expected "accelerated growth in our consumer category" in 2014.

### D. Second Quarter 2014 Release.

54.    By July 31, 2014, however, the Company showed signs of weakness when it issued a press release and held an earnings call with disappointing financial results for the second quarter of 2014. These problems were attributed to an inability to increase manufacturing capacity quickly enough to meet demand for direct metal printers, and a delay in the release of its new Cube 3 and CubePro consumer printers to "improve user experience."

55.    In an earnings release, the Company reported reduced revenue ($151.5 million vs.

forecasted $162.3 million) and organic growth (10% vs. 28% the previous quarter), which stood in contrast to the 30% organic growth rate the Company had been touting just a few months before. The Company also reported reduced gross margins (47.8% vs. forecasted 51%), reflecting an inventory write-off resulting from the "aggressive shift to multiple new products."

56.     These disclosures stood in contrast to the highly positive statements about sales and revenue growth in previous quarters. However, the Company indicated that improvement was imminent. Quoting defendant Reichental, the earnings release highlighted "[r]ecord bookings for our design and manufacturing printers together with rising orders for our consumer products," higher expectations in the second half, and gross profit margins "poised to rebound and resume their expansion trajectory." Annual revenue guidance was even raised from $700 million to $740 million.

57.     In a subsequent earnings conference call, defendant Reichental responded to analyst concerns by claiming "of course, we are not slowing down. We're actually speeding up."

**E.  Third Quarter 2014 Release.**

58.     Contrary to these rosy statements, however, the Company revealed continuing manufacturing problems before the market opened on October 22, 2014, when it disclosed preliminary earnings for the third quarter of 2014. The Company announced a "revenue shortfall from the continued manufacturing capacity constraints for our direct metal printers and delayed availability of our newest consumer products [the Cube 3 and CubePro printers]." The Company further reduced guidance from a range of $700-$740 million to a range of $650-$690 million.

59.     In a subsequent earnings conference call, however, defendant Reichental made a series of optimistic statements, stating that "we believe that we are back on track, we obviously are very disappointed even though we worked really, really hard that we couldn't achieve it during the third quarter. And we believe that in the fourth quarter we will have all the capacity that we need to deliver

direct metal 3D printers to the market." Also during the call, defendant Reichental assured that 3D Systems was effectively integrating its newly acquired companies: "[T]he integration is going extremely well. And all of these companies have been completely on boarded as per usual."

60.    In an earnings release dated November 10, 2014, the Company announced third quarter revenue of $166.9 million on strong demand for its design, manufacturing and healthcare products and services, resulting in third quarter GAAP earnings of $0.03 per share. The release continued that strong demand was "not enough to overcome the revenue shortfall that resulted from the company's continued manufacturing constraints for direct metal printers and the delayed availability of its newest consumer products."

61.    While the earnings release once again acknowledged "manufacturing constraints" that limited sales, defendant Reichental nevertheless made positive statements, claiming that he expected the "revenue growth rate to increase" because the problems were solved, and that "while growing pains led to our revenue shortfall and pressured our gross profit margin, the fundamentals of our business are intact and our gross profit margins are poised to resume their expansion."

62.    In a subsequent earnings conference call, defendant Reichental was again making positive statements, stating that the Company had taken "decisive measures to remediate" performance gaps which would allow it to "fulfill the increasing metal printers demand." Defendant Reichental also stressed "the early reception for our Cube 3 and Cube Pro have been phenomenally positive" and the Company expected to see "greater contribution from our latest consumer product in the fourth quarter - and, by the way, well into next year. We're just beginning."

63.    Finally, defendant Reichental downplayed any adverse effects associated with the Company's acquisitions. According to defendant Reichental, "and I think what you should really take note of is that, even in a period that we had a high concentration of acquisitions, we still managed to

expand our gross profit margin, which for that particular business right now is our primary objective - to fully integrate, to put it all on the same platform, and to continue to expand margin. We have done it really well, and we expect that that will bode well for us in the future." He continued: "Going forward - again, absent significant acquisitions that come with inventory, going forward, expect inventory to level off and to just incrementally fluctuate in support of portfolio additions."

**F.  Fourth Quarter and Year-End 2014 Release.**

64.    In a February 26, 2015 earnings release, the Company reported "record" revenue of $187.4 million, representing a 21% increase over the comparable 2013 quarter, and GAAP earnings of $0.01 per share. For the full fiscal year, the Company reported revenue of a "record" $653.7 million and GAAP earnings of $0.11 per share. The release reported increases of direct metal and consumer quarterly revenue by 178% and 68%, respectively, and 2015 revenue guidance of $850-$900 million.

65.    In a subsequent earnings conference call, defendant Reichental stated that "while higher spending levels in support of our expansion plans pressured our earnings throughout 2014, as we fast-tracked assembly of the talent, assets and infrastructure required to take our business to the next level . . . . we expect to recover our operating leverage and expand our profitability throughout 2015." He continued that "having assembled the technological building blocks, infrastructure, talents and partners required to scale our business and extend our first mover advantage in key verticals, we are now poised to strengthen our execution to create greater value faster."

66.    Defendant Reichental also stated an expectation for "organic growth for 2015 to increase progressively . . . extending throughout the year progressively, all the way up to 30% for Q4" and that the Company would capitalize on its "effective and disciplined" acquisitions: "Having assembled the technology building blocks, infrastructure, and talents required to scale our business and extend our first mover advantage in key verticals, we believe that we're now poised to leverage all

of our fundamental assets and strengthen our execution to create greater value faster."

67.    On February 26, 2015, 3D Systems also filed its 2014 Form 10-K. The Form 10-K described the Company's financial results, including increased revenue growth and gross profit, and stated that the Company was "continu[ing] to develop new products and services and have expanded our technology platform and 3D ecosystem through internal developments, relationships with third parties and acquisitions." The Form 10-K was signed by each of the Individual Defendants.

### III.    The Truth Comes Out.

68.    On May 6, 2015, the drumbeat of positive statements gave way as the truth about the Company's operating difficulties became apparent. The Company issued an earnings release citing weakness in demand attributed to performance issues in certain metal and nylon applications, which delayed its ability to sell printers during the first quarter of 2015. Shockingly, the press release also withdrew the Company's previously stated guidance "given marketplace uncertainties."

69.    In the press release, defendant Reichental stated that the Company had ceased its acquisition strategy  to focus on "accelerat[ing] our planned integration productivity and efficiency measures," including leveraging and optimizing infrastructure, driving operational synergies and cost downs and "enhancing and expanding our quality processes and organizing our business practices to better align our talents and technologies with market opportunities."

70.    In an earnings conference call that day, defendant Reichental expressed disappointment with the Company's results. Defendant Reichental blamed certain economic factors and "several metal and nylon applications and performance issues," which "delayed our ability to sell another approximately $5 million worth of printers during the quarter."

71.    At an investor conference, 3D Systems executive Hugh Evans confirmed that, in reality, the acquisition strategy had placed stress on the Company, stating: "Yes, we are addressing all

facets of the Company to effectively -- we've bought 50 companies in the last five years. So we are now going to consolidate, integrate, and leverage all of our assets to improve our margins, take costs out, and control what we can control. That's what we can control and so there's initiatives across the whole Company to integrate more effectively and extract the efficiencies that are there, so that as the new wave comes, we have a margin structure that's going to be enviable."

72.    On August 6, 2015, the Company issued a press release announcing negative financial results for the second quarter of fiscal year 2015, stemming from the same operating inefficiencies. As stated in the press release, this "challenging operating environment" resulted in a drop in organic growth to just 2% for the second quarter, as well as an inventory write-off. Defendant Reichental attributed the poor results to the Company having taken on too many acquisitions within a short time period which negatively impacted the quality of 3D Systems' products:

> While a period of high growth enabled us to acquire strategic assets and build critical expertise, our rapid expansion permitted certain operating inefficiencies that we are currently addressing. Specifically, we are enhancing the quality of our products and services, accelerating synergy and cost reduction measures, driving process improvements and working closely with our channel partners to improve our sales operations and worldwide coverage.

73.    On a conference call with analysts, 3D Systems executive David Styka reiterated defendant Reichental's comments in the press release concerning the operating inefficiencies that resulted from 3D Systems' rapid expansion through its acquisition strategy:

> As Avi [Reichental] mentioned earlier, the recent period of high growth allowed us to assemble key assets and expertise, but this phase also permitted certain operating inefficiencies. Therefore, during this challenging period, we are focusing on driving productivity and efficiency measures to achieve greater operational leverage. Specifically, we are continuing to consolidate facilities, shed less profitable activities, accelerate synergy and cost reduction measures, and drive process improvement.

74.    On October 29, 2015, it was announced that defendant Reichental had abruptly "stepped down" from his position as President and CEO. No explanation was provided, although 3D

Systems said it was by "mutual agreement" with the Board. One analyst stated that Reichental was "pushed out" due to investor frustration over the last couple of years. An article posted on 3Dprint.com regarding 3D Systems on October 29, 2015 elaborated as follows:

> The Frankensteinian nature of 3D Systems has always been a worry to many in the industry. The company, seemingly desperate for innovation and a desire to meet impossible promises to investors and an eager public, tried to simply buy their way to success. Over the last few years the company has made more than a dozen high-profile purchases of startups, several of them completely untested with no plan for commercialization. . . .
>
> Integrating acquired companies into an existing one is always difficult and often leads to growing pains as they settle into their new roles. But it seems like adding so many companies so quickly made it virtually impossible to pull together a unified corporate culture. Many of 3D Systems' recent acquisitions included high-paid executive or management positions, making the already top-heavy company even more unbalanced. A commonly recurring complaint from employees has been that many managers tended to look out for themselves not the company as a whole. Combine all of that with accusations of the company allegedly cutting out resellers from large deals and contracts, accusations of alleged unethical sales tactics and what some have called deliberate obfuscation of their technologies' actual capabilities, the unrest and discord has been building from all sides.

75.    On November 4, 2015, 3D Systems announced financial results for the third quarter of fiscal year 2015. During a conference call to discuss the results, executives expressed their disappointment with lower revenue from 3D printing products and services, blaming the "residual reputational damage as a result of our earlier printer performance issues" as well as "printer performance and quality issues in the field." During this call, an executive stated that the Company experienced "negative organic growth in all of our regions, Americas, EMEA, and APAC."

76.    On February 26, 2016, the Company announced that it would be unable to timely file its 2015 Form 10-K "because additional time, resources and effort are required to complete work related to a goodwill and intangible asset impairment charge." The stock currently trades around $11 per share, down from its high during the relevant period of $96 per share.

**IV.    The Securities Class Action.**

77.    Beginning on June 12, 2015, several securities class action lawsuits were filed in the U.S. District Court for the District of South Carolina against the Company and several of its officers, including defendants Reichental and Gregoire. In a consolidated complaint filed on December 9, 2015, a large institutional shareholder as lead plaintiff asserted claims for securities fraud, alleging that the defendants issued false and misleading statements about the Company's performance between October 29, 2013 and May 5, 2015, causing the stock price to be artificially inflated and damaging those who purchased or acquired 3D Systems common stock during this period.

78.    Specifically, the lead plaintiff alleges that the Company and the defendant officers failed to disclose contemporaneous material adverse information regarding the Company's deteriorating operating performance, even while these defendants were making aggressive revenue and production growth projections in earnings releases, earnings conference all and SEC filings. For example, the consolidated complaint alleges that:

- The Company suffered from undisclosed integration problems due to its aggressive pace of acquisitions.

- The Company suffered from undisclosed manufacturing constraints, particularly with respect to its direct metals printers, which were fabricated at a newly acquired company in France which was woefully unprepared to keep up with order volume.

- The Company's consumer products, including the CubePro, had quality problems which were causing product returns.

- The Company's inventory processes were deficient, hampering production.

- The Company forced products into the channel at quarter-end by providing substantial discounts and extended payment terms to customers, and shipped incomplete orders to bolster reported revenue.

20

- The Company's SEC filings on Forms 10-Q and 10-K were false and misleading in failing to disclose material adverse facts regarding the Company's performance.

79.    The securities class action remains pending and has exposed the Company to potentially massive liability.

### V.    Defendants' Stock Sales.

80.    During the relevant period when the stock price was inflated, certain defendants collectively sold approximately 550,000 shares of 3D Systems common stock for $33 million in proceeds while in possession of material adverse nonpublic information regarding the Company's declining business prospects. Some of these sales occurred in late 2013 as the stock price soared to over $90 per share in response to the Company's bullish statements.

81.    At the time of these stock sales, each trader was in possession of material adverse inside information regarding the Company's integration, production and inventory problems. This was core information going to the Company's primary performance drivers. Each stock sale was motivated in whole or in part by said material adverse inside information.

82.    Defendants' trades were unusual in timing and amount, as they followed closely upon the dissemination of aggressive statements about the Company's operating performance, which had no reasonable basis in reality given the Company's integration, production and inventory problems. These trades represented a concerted effort by corporate insiders to profit from insider trading, as two principal executives (Reichental/CEO and Gregoire/CFO), and the Company's co-founder (Hull), sold large quantities of stock even though they assured shareholders that the Company would imminently be experiencing massive growth.

83.    In particular, between December 2013 and August 2014, defendant Reichental sold 144,000 shares for proceeds of $8.8 million.

84.    Between November 2013 and November 2014, defendant Gregoire sold 162,500 shares for proceeds of $8.9 million.

85.    Between May 2014 and March 2015, defendant Hull sold 75,000 shares for proceeds of $3.1 million.

86.    Between November 2013 and March 2014, defendant Loewenbaum sold 151,000 shares for proceeds of $11.2 million.

87.    In November 2013, defendant Moore sold 15,000 shares for proceeds of $1 million.

### DERIVATIVE AND DEMAND EXCUSAL ALLEGATIONS

88.    Plaintiff brings this action on behalf of 3D Systems to redress injuries suffered, and to be suffered, by 3D Systems as a direct result of violations of the breaches of fiduciary duty alleged herein. 3D Systems is named as a nominal defendant solely in a derivative capacity.

89.    Plaintiff will adequately and fairly represent the interests of 3D Systems in enforcing and prosecuting its rights and have hired counsel experienced in shareholder litigation.  Plaintiff was a shareholder of 3D Systems during the period of the wrongdoing complained of, has continuously been a shareholder since that time, and is a current 3D Systems shareholder.

90.    Demand on the Board to bring this action has not been made and is not necessary because such demand would be futile.  At the time of the filing of this complaint, 3D Systems' Board consisted of ten members, nine of whom are named as defendants in this action – Hull, Loewenbaum, Moore, Van Riper, Curran, Kever, Welke, Diamandis and Humes. Demand on these directors is excused for the reasons that follow.

91.    Hull: Demand on Hull is excused because he engaged in unlawful insider trading during the relevant period. As alleged herein, Hull sold 3D Systems' stock motivated in whole or in

part by material adverse inside information. Accordingly, due to Hull's participation in illegal insider trading and his exposure to potential individual liability, he cannot be disinterested and cannot exercise independent business judgment on the issue of whether the Company should prosecute this action. Hull's insider selling renders demand against him futile for the additional reason that he cannot exercise independent judgment when considering illegal insider selling claims against the other traders because he engaged in the same illegal conduct.

92.    In addition, Hull signed the Company's Form 10-K for fiscal years 2013 and 2014 which failed to disclose the material adverse information alleged herein.  Hull breached his fiduciary duties of loyalty and good faith by knowingly or recklessly causing the dissemination of misleading statements to shareholders and the market. The dissemination of misleading statements is not a valid exercise of business judgment, excusing demand.

93.    Finally, Hull is a co-founder of the Company and serves as one of its executives. According to the Company's Proxy Statement, Hull is not an independent director under applicable listing standards, excusing demand.  Hull would never vote to pursue action because to do so would jeopardize his primary source of income, including substantial executive compensation and his consulting agreement which will take effect once he retires, as alleged herein.

94.    Loewenbaum: Demand on Loewenbaum is excused because he engaged in unlawful insider trading during the relevant period. As alleged herein, Loewenbaum sold 3D Systems' stock motivated in whole or in part by material adverse inside information. Accordingly, due to Loewenbaum's participation in illegal insider trading and his exposure to potential individual liability, he cannot be disinterested and cannot exercise independent business judgment on the issue of whether the Company should prosecute this action. Loewenbaum's insider selling renders demand against him futile for the additional reason that he cannot exercise independent judgment when considering illegal

insider selling claims against the other traders because he engaged in the same illegal conduct.

95.    In addition, Loewenbaum signed the Company's Form 10-K for fiscal years 2013 and 2014 which failed to disclose the material adverse information alleged herein. Loewenbaum breached his fiduciary duties of loyalty and good faith by knowingly or recklessly causing the dissemination of misleading statements to shareholders and the market. The dissemination of misleading statements is not a valid exercise of business judgment, excusing demand.

96.    Furthermre, Loewenbaum receives substantial benefits from his service on the 3D Systems' Board. These benefits are material and they are material to Loewenbaum. He would never jeopardize these benefits by voting to sue the Company's officers and directors.

97.    <u>Moore</u>: Demand on Moore is excused because he engaged in unlawful insider trading during the relevant period. As alleged herein, Moore sold 3D Systems' stock motivated in whole or in part by material adverse inside information. Accordingly, due to Moore's participation in illegal insider trading and his exposure to potential individual financial liability, he cannot be disinterested and cannot exercise independent business judgment on the issue of whether the Company should prosecute this action. Moore's insider selling renders demand against him futile for the additional reason that he cannot exercise independent judgment when considering illegal insider selling claims against the other traders because he engaged in the same illegal conduct.

98.    In addition, Moore served on the Audit Committee of the Board at all relevant times. As a member of the Audit Committee, Moore had a special relationship with the Company.  By charter, the Audit Committee quarterly "participate[s] (either the Chairman of the Committee and/or the Committee as a whole) in a telephonic meeting among management of the Company, the internal auditor and the independent auditor prior to each earnings release" and "review[s] the periodic reports of the Company with management of the Company, the internal auditor and the independent auditor

prior to filing of the reports with the Securities and Exchange Commission."

99.    Thus, as an Audit Committee member, Moore had specific responsibilities for disclosures to shareholders and the integrity of the Company's reporting practices. Indeed, Moore signed the Company's Form 10-K for fiscal years 2013 and 2014, which contained false and misleading statements. Moore breached his fiduciary duties of loyalty and good faith by knowingly or recklessly causing the dissemination of misleading statements to shareholders and the market. The dissemination of misleading statements is not a valid exercise of business judgment, excusing demand.

100.    Furthermore, Moore receives substantial benefits from his service on the 3D Systems' Board. These benefits are material and they are material to Moore. He would never jeopardize these benefits by voting to sue the Company's officers and directors.

101.    <u>Van Riper</u>: Van Riper served on the Audit Committee of the Board at all relevant times. As a member of the Audit Committee, Van Riper had a special relationship with the Company. By charter, the Audit Committee quarterly "participate[s] (either the Chairman of the Committee and/or the Committee as a whole) in a telephonic meeting among management of the Company, the internal auditor and the independent auditor prior to each earnings release" and "review[s] the periodic reports of the Company with management of the Company, the internal auditor and the independent auditor prior to filing of the reports with the Securities and Exchange Commission."

102.    Thus, as an Audit Committee member, Van Riper had specific responsibilities for disclosures to shareholders and the integrity of the Company's reporting practices. Indeed, Van Riper signed the Company's Form 10-K for fiscal years 2013 and 2014, which contained false and misleading statements. Van Riper breached his fiduciary duties of loyalty and good faith by knowingly or recklessly causing the dissemination of misleading statements to shareholders and the

market. The dissemination of misleading statements is not a valid exercise of business judgment, excusing demand.

103.    Furthermre, Van Riper receives substantial benefits from his service on the 3D Systems' Board. These benefits are material and they are material to Van Riper. He would never jeopardize these benefits by voting to sue the Company's officers and directors.

104.    Curran: Curran served on the Audit Committee of the Board at all relevant times. As a member of the Audit Committee, Curran had a special relationship with the Company.  By charter, the Audit Committee quarterly "participate[s] (either the Chairman of the Committee and/or the Committee as a whole) in a telephonic meeting among management of the Company, the internal auditor and the independent auditor prior to each earnings release" and "review[s] the periodic reports of the Company with management of the Company, the internal auditor and the independent auditor prior to filing of the reports with the Securities and Exchange Commission."

105.    Thus, as an Audit Committee member, Curran had specific responsibilities for disclosures to shareholders and the integrity of the Company's reporting practices. Indeed, Curran signed the Company's Form 10-K for fiscal years 2013 and 2014, which contained false and misleading statements. Curran breached his fiduciary duties of loyalty and good faith by knowingly or recklessly causing the dissemination of misleading statements to shareholders and the market. The dissemination of misleading statements is not a valid exercise of business judgment, excusing demand.

106.    Furthermore, Curran receives substantial benefits from his service on the 3D Systems' Board. These benefits are material and they are material to Curran. He would never jeopardize these benefits by voting to sue the Company's officers and directors.

107.    Kever: Kever signed the Company's Form 10-K for fiscal years 2013 and 2014 which

failed to disclose the material adverse information alleged herein. Kever breached his fiduciary duties of loyalty and good faith by knowingly or recklessly causing the dissemination of misleading statements to shareholders and the market. The dissemination of misleading statements is not a valid exercise of business judgment, excusing demand.

108.    Furthermore, Kever receives substantial benefits from his service on the 3D Systems' Board. These benefits are material and they are material to Kever. He would never jeopordize these benefits by voting to sue the Company's officers and directors.

109.    Welke: Welke signed the Company's Form 10-K for fiscal years 2013 and 2014 which failed to disclose the material adverse information alleged herein. Welke breached her fiduciary duties of loyalty and good faith by knowingly or recklessly causing the dissemination of misleading statements to shareholders and the market. The dissemination of misleading statements is not a valid exercise of business judgment, excusing demand.

110.    Furthermore, Welke receives substantial benefits from her service on the 3D Systems' Board. These benefits are material and they are material to Welke. She would never jeopordize these benefits by voting to sue the Company's officers and directors.

111.    Diamandis: Diamandis signed the Company's Form 10-K for fiscal years 2013 and 2014 which failed to disclose material adverse information alleged herein. Diamandis breached his fiduciary duties of loyalty and good faith by knowingly or recklessly causing the dissemination of misleading statements to shareholders and the market. The dissemination of misleading statements is not a valid exercise of business judgment, excusing demand.

112.    Furthermore, Diamandis receives substantial benefits from his service on the 3D Systems' Board. These benefits are material and they are material to Diamandis. He would never jeopardize these benefits by voting to sue the Company's officers and directors.

113.  <u>Humes</u>: Humes signed the Company's Form 10-K for fiscal year 2014 which failed to disclose the material adverse information alleged herein. Humes breached his fiduciary duties of loyalty and good faith by knowingly or recklessly causing the dissemination of misleading statements to shareholders and the market. The dissemination of misleading statements is not a valid exercise of business judgment, excusing demand.

114.  Furthermore, Humes receives substantial benefits from his service on the 3D Systems' Board. These benefits are material and they are material to Diamandis. He would never jeopardize these benefits by voting to sue the Company's officers and directors.

115.  Demand is further excused because the Company is named as a defendant in the securities class action lawsuit, and if the Company pressed forward with its claims against the defendants in this case, then the Company's efforts could undercut or even compromise the defense of the securities class actions, excusing demand.

## COUNT I

## BREACH OF FIDUCIARY DUTY – INSIDER TRADING

116.  Plaintiff incorporates by reference the allegations set forth in the preceding paragraphs.

117.  By reason of their positions as directors and/or officers of 3D Systems, at the time the trading defendants sold their 3D Systems' shares, each had access to and knew highly material information regarding 3D Systems, and knew that the public disclosure of this information would adversely affect the market price of 3D Systems' stock.

118.  In selling their stock, as set forth above, the trading defendants used the Company's material, non-public information for personal gain, in breach of their fiduciary duties

to the Company and its shareholders. Defendants' trades were motivated in whole or in part by said material, non-public information.

119.    By reason of the aforesaid insider sales, the trading defendants profited through their fiduciary positions.

120.    The trading defendants are obliged to disgorge these unlawful profits for the benefit of 3D Systems.

121.    As a result of the misconduct alleged herein, defendants are liable to 3D.

## COUNT II

## BREACH OF FIDUCIARY DUTY

122.    Plaintiff incorporates by reference the allegations set forth in the preceding paragraphs.

123.    The Individual Defendants owed and owe the Company fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight and supervision.

124.    The Individual Defendants violated and breached their fiduciary duties of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight and supervision.

125.    The Individual Defendants each knowingly or recklessly approved the issuance of false statements that misrepresented and failed to disclose material information concerning the Company.

126.    These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

127.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, 3D Systems has sustained significant damages.

128.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the

Company.

## COUNT III

## CONTRIBUTION AND INDEMNIFICATION

129.    Plaintiff incorporates by reference the allegations set forth above.

130.    3D is liable to private and public persons, entities, and/or classes by virtue of the same facts or circumstances as are alleged herein to give rise to the Individual Defendants' liability to 3D.

131.    3D's alleged liability on account of the wrongful acts and practices and related misconduct described above arises, in whole or in part, from the knowing, reckless, and/or disloyal acts or omissions of the Individual Defendants.

132.    3D is entitled to contribution and indemnification from each of the Individual Defendants in connection with all such claims that have been, are, or may in the future be asserted against 3D by virtue of the Individual Defendants' wrongdoing.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of 3D, demands judgment as follows:

A.    Determining that this suit is a proper derivative action and certifying plaintiff as an appropriate representative of 3D Systems for said action;

B.    Declaring that the Individual Defendants have violated their fiduciary duties to 3D and its shareholders;

C.    Awarding disgorgement of unlawful insider trading proceeds and improper compensation to 3D Systems, along with damages sustained by 3D Systems as a result of the Individual Defendants' breaches of fiduciary duties, in an amount to be determined at trial, together with pre-judgment and post-judgment interest;

D.    Equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including (a) the institution of appropriate corporate governance reforms and internal control improvements to remediate and prevent the recurrence of the misconduct alleged herein, and (b) attaching, impounding, imposing a constructive trust on, or otherwise restricting the Individual Defendants' assets so as to assure that plaintiff has an effective remedy;

E.    Awarding plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: April 1, 2016

STROM LAW FIRM, LLC

s/J. Preston Strom, Jr.
J. Preston Strom, Jr. (Fed. I.D. No. 4354)
Mario A. Pacella (Fed. I.D. No. 7538)
2110 Beltline Boulevard
Columbia, South Carolina 29204
Tel: 803.252.4800
Fax: 803.252.4801

SCHUBERT JONCKHEER & KOLBE LLP
Robert C. Schubert
Willem F. Jonckheer
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220